NOT DESIGNATED FOR PUBLICATION

No. 119,661

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

ZACHARY MITCHELL HUTCHENS,
*Appellant.*


MEMORANDUM OPINION

Appeal from Pawnee District Court; BRUCE T. GATTERMAN, judge. Opinion filed March 20, 2020. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., ATCHESON and SCHROEDER, JJ.

PER CURIAM: Zachary Mitchell Hutchens appeals his convictions of aggravated kidnapping, aggravated endangering a child, and felony and misdemeanor theft. Hutchens claims: (1) there was insufficient evidence of bodily harm to support his conviction of aggravated kidnapping; (2) the district court gave a legally inappropriate definition of "bodily harm" in the jury instruction on aggravated kidnapping; (3) the district court erred in admitting his statements to law enforcement officers in violation of *Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); (4) the district court erred by admitting the dash cam video of his encounter with law enforcement; and

1

(5) he was denied a fair trial based on cumulative error. Finding no reversible error, either individually or cumulatively, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In August 2016, Hutchens began a sporadic dating relationship with M.D., a 17-year-old, who lived in Larned. By early September, the relationship had ended. On September 6, 2016, Hutchens sent M.D. a text message asking her to return some personal items. M.D. was scheduled to begin a shift at the Larned Pizza Hut at 5 p.m. but arranged to meet Hutchens at a park near her residence just before she needed to go to work. M.D. drove to the park, planning to leave from the park to go to work.

While at the park in Larned, Hutchens and M.D. started arguing. M.D. told Hutchens that she was going to leave. Hutchens grabbed M.D.'s phone and car keys and refused to return them when she requested them. M.D. then told Hutchens that she would walk home and get a ride to work. She turned away to begin walking home, but Hutchens told her to get back to the car. When she refused, he grabbed her arm, threatened to hit her, and guided her back to the car. When M.D. continued to refuse to get into the car, Hutchens pushed her into the car. He then told her to move over to the passenger seat, and she complied because she feared Hutchens when he was angry.

Hutchens got into the driver's seat of M.D.'s car and drove from the park to the highway towards Great Bend. Before reaching the highway, Hutchens had to stop at a couple of intersections. At each of these, M.D. tried to get out of the car and each time Hutchens grabbed her hair and pulled her back into the car. As M.D. continued to cry, Hutchens told her to "shut up," called her a "bitch," and pulled her hair.

Once on the highway, M.D. requested her phone. Hutchens replied, "Yeah," and tossed her phone out of the car window. As they passed through Great Bend, Hutchens

2

was again required to stop at traffic lights. Twice M.D. again tried to escape the vehicle, and each time Hutchens grabbed her hair to pull her back into the car. During the drive, Hutchens also punched M.D. in the head, on a leg, and in the stomach. At the intersection of 10th Street and Main in Great Bend, M.D. made eye contact with the driver of a truck in the next lane. The truck driver, Kevin Ensley, observed the driver in the next car "grab a girl by the hair and was beating on her." M.D. silently mouthed the words to Ensley, "Help me. Help me. Please help me." Ensley also witnessed the driver of the car hit M.D. in the head, but he could not see the driver to identify Hutchens at trial. Ensley called 911 to report the incident and he described the vehicle. The dispatcher asked Ensley to continue to follow the vehicle until law enforcement could intercept the vehicle.

Hutchens left Great Bend and drove to Ellinwood. The dispatcher had contacted Ellinwood Police Officer Jarrod Carr, who waited along the highway into Ellinwood from Great Bend until he observed a vehicle matching the description provided by Ensley. He noted a male was driving the vehicle. Carr began following the vehicle, and Hutchens made several turns through the town, trying to lose Carr. Eventually, Hutchens stopped the vehicle in an alley and ordered M.D. to change places with him. M.D. complied. Carr then caught up with the vehicle and activated his emergency lights.

Based on what Ensley had reported and his own observations, Carr approached the passenger side of the vehicle to conduct a welfare check. But when he approached the passenger side, a male was sitting in the seat. Carr informed the occupants that he had received a complaint of erratic driving and requested identification from both occupants. Hutchens told Carr that he did not have any identification.

M.D. was distraught. After finding her license, she requested permission to leave the vehicle. Carr permitted her to leave the vehicle but required Hutchens to remain in the vehicle. After Carr had spoken to M.D. outside the vehicle, other officers arrived. Carr then asked M.D. to wait in his patrol car while the officers spoke to Hutchens. Carr spoke

3

to Hutchens, who claimed that he could not have held M.D. against her will because she had been driving. Carr then returned to his patrol car to interview M.D., who provided a different account. M.D. told Carr that Hutchens had been driving the vehicle and during the trip "he punched me in the stomach multiple times, he pulled my hair, he punched my legs." Carr stepped outside and confronted Hutchens about driving the car. Hutchens continued to deny that he drove the car or held M.D. against her will.

In talking more with M.D., Carr recalled that he saw Hutchens driving as they entered town. He confronted Hutchens with this information, and Hutchens changed his story, admitting that he drove to Ellinwood because M.D. said that her leg was hurting but denying that he forced M.D. to come with him against her will. The sheriff's deputies conducted a pat-down search of Hutchens. After some further delay to confer about the situation, the officers arrested Hutchens.

The officers released M.D.'s car to her, and they instructed her to file a report with the Larned Police Department when she returned to town. She complied with those instructions. Her foster father met her at the police station when she finished her report. M.D.'s foster father noted that M.D. was distraught and frightened, and he later testified that the incident "changed her whole life." M.D. dropped out of college and refused to sleep in her bedroom for weeks after the incident, fearing to be alone. She did not suffer any lasting physical injuries, but she suffered a headache from having her hair pulled.

On September 7, 2016, the State charged Hutchens with aggravated kidnapping, theft of M.D.'s vehicle, criminal threat, aggravated endangering a child, and misdemeanor theft of M.D.'s cell phone. After a preliminary hearing on December 1, 2016, the district court bound Hutchens over for trial on all the felony counts.

On June 16, 2017, Hutchens moved to dismiss the aggravated kidnapping charge or to amend the charge to simple kidnapping because M.D. testified at the preliminary

4

hearing that she did not suffer any actual harm. The State responded that hitting M.D. in the head and pulling her hair constituted bodily harm under the aggravated kidnapping statute. The court ultimately ruled that the existence of bodily harm constituted a question of fact for the jury and denied the motion.

The jury trial began on October 10, 2017. The State presented seven witnesses including M.D., Ensley, and Carr. Over defense counsel's objection, the court also permitted the State to play the officer's dash cam video—with some minor redactions—for the jury. Hutchens opted not to present any evidence. Hutchens moved for judgment of acquittal on several charges. The court denied the motion except for the charge of criminal threat. The jury convicted Hutchens of the remaining charges.

Hutchens filed a motion for new trial, arguing that the admission of the dash cam video prejudiced his right to a fair trial. The district court ultimately denied the motion. Hutchens also moved for a sentencing departure based on his claims that he had a supportive family, he was relatively young, he had some mental disabilities, and the victim suffered a minimum amount of harm. The district court approved Hutchens' request for a psychological evaluation before sentencing.

At sentencing on May 29, 2018, the district court found without objection that Hutchens was in criminal history category "A." The district court denied the departure motion and imposed the standard presumptive sentence of 620 months' imprisonment for the aggravated kidnapping conviction. The district court imposed a controlling sentence of 626 months' imprisonment for all the convictions. Hutchens timely appealed.

SUFFICIENCY OF THE EVIDENCE TO SUPPORT AGGRAVATED KIDNAPPING

Hutchens first claims there was insufficient evidence of bodily harm to support his conviction of aggravated kidnapping. More specifically, Hutchens argues that the "record

5

does not contain evidence to support a finding that [he] caused bodily harm [upon M.D.] other than that present in any forcible kidnapping." Hutchens concedes that the evidence is sufficient to support a conviction of kidnapping, and he asks that we remand with directions to resentence him for kidnapping. The State argues that viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence of bodily harm to support the aggravated kidnapping conviction.

The appellate review for a challenge to the sufficiency of the evidence in a criminal case is well established. A reviewing court examines the evidence in a light most favorable to the State as the prevailing party—adopting the version of conflicting accounts that most supports the State's case and drawing reasonable inferences in favor of the State—to determine whether a rational fact-finder could find beyond a reasonable doubt that the defendant committed the offense for which he or she was convicted. See *State v. Rizal*, 310 Kan. 199, 209-10, 445 P.3d 734 (2019); *State v. Darrow*, 304 Kan. 710, 716, 374 P.3d 673 (2016) (discussing an appellate court's need to examine all evidence, direct and circumstantial, in a light most favorable to the State).

As charged, to prove that Hutchens committed aggravated kidnapping, the State had to prove (1) that Hutchens took or confined M.D. by force or threat, (2) that he did so with the intent to hold her to inflict bodily injury or to terrorize her, (3) that Hutchens inflicted bodily harm on her, and (4) that the act occurred in Pawnee County. The distinguishing feature between simple kidnapping and aggravated kidnapping is the infliction of bodily harm. K.S.A. 2019 Supp. 21-5408(b). On appeal, Hutchens does not challenge the evidence supporting the elements of kidnapping; he only challenges the evidence of bodily harm to M.D., elevating the offense to aggravated kidnapping.

Bodily harm under the aggravated kidnapping statute is any touching of the victim, against the will of the victim, with physical force in an intentional, hostile, and aggravated manner but includes only unnecessary acts of violence upon the victim, not

6

trivial or incidental injuries associated with an abduction or confinement. See *State v. Peltier*, 249 Kan. 415, 421-22, 819 P.2d 629 (1991); *State v. Smith & Miller*, 224 Kan. 662, 672, 585 P.2d 1006 (1978) (gratuitous violence to victim before taking occurred supported bodily harm element for aggravated kidnapping), *modified on other grounds* 225 Kan. 199, 588 P.2d 953 (1979); *Crowther v. State*, 45 Kan. App. 2d 559, 572, 249 P.3d 1214 (2011). As *Crowther* demonstrates, the bodily harm element of aggravated kidnapping may be satisfied by unnecessary violence during the abduction or any violence after the abduction is accomplished because such violence is also unnecessary to effect the kidnapping. 45 Kan. App. 2d at 572. Nor does the law require lasting or visible injuries to constitute bodily harm for aggravated kidnapping. *State v. Daniels*, 278 Kan. 53, 57, 91 P.3d 1147 (2004) ("In the context of aggravated kidnapping, bodily harm includes any act of physical violence even though no permanent injury results."); *State v. Taylor*, 217 Kan. 706, 713-14, 538 P.2d 1375 (1975).

Hutchens argues that the State failed to present any evidence that he inflicted bodily harm on M.D. in addition to the force that is required for any confinement. He argues that "there is no evidence that [M.D.] was required to obtain medical treatment" and that she only sustained "trivial injuries that were attendant to a kidnapping." M.D. testified that each time she tried to get out of the car at stops in Great Bend, Hutchens pulled her back in by the hair. We agree that this bodily harm was incidental to the act of confinement. But M.D. also testified that Hutchens punched her in the head during the drive to Great Bend. She later reported to Carr that during the trip "[Hutchens] punched me in the stomach multiple times, he pulled my hair, he punched my legs." And Ensley also testified that he witnessed the driver of the car hit M.D. in the head.

Viewing the evidence in a light most favorable to the State, Hutchens pulled M.D.'s hair and punched her multiple times during the drive. Even if we would find that pulling her hair was incidental to Hutchens' attempts to confine M.D., the State presented evidence that on at least one occasion, Hutchens pulled her hair because M.D. refused to

7

stop crying. M.D. also testified that Hutchens punched her in the stomach, the leg, and the head during the drive to Great Bend. And Ensley saw the driver of the car hit M.D. in the head at an intersection in Great Bend. These were unnecessary acts of violence upon M.D., not trivial or incidental injuries associated with the abduction or confinement. See *Peltier*, 249 Kan. at 421-22. Although the evidence showed that M.D. did not sustain any permanent physical injuries, the law does not require lasting or visible injuries to constitute bodily harm for aggravated battery. See *Daniels*, 278 Kan. at 57.

The Kansas Legislature defines the crime of aggravated kidnapping, and it also establishes the severity level of the offense. Considering the evidence presented at trial in the light most favorable to the State, we conclude there was sufficient evidence that Hutchens inflicted unnecessary bodily harm on M.D. in the course of the kidnapping to support his conviction of aggravated kidnapping.

JURY INSTRUCTION ON AGGRAVATED KIDNAPPING

Hutchens next claims the district court gave a legally inappropriate definition of "bodily harm" in the jury instruction on aggravated kidnapping. At trial, Hutchens opposed any definition of bodily harm. The district court gave a definition offered by the State but also added language requested by Hutchens. Still, Hutchens objected and argued that the definition amounted to "adding elements to the crime that don't exist." On appeal, Hutchens argues that the "district court gave a legally inappropriate instruction defining 'bodily harm' that was unnecessary and improperly removed an element of the crime from the jury's consideration."

The State first asserts that Hutchens' argument on appeal differs from the one preserved at trial, so we should review his new claim for clear error. See K.S.A. 2019 Supp. 22-3414(3). The State then argues that the jury instruction on bodily harm was appropriate, but even if there was error, reversal is not required.

8

The State is correct that Hutchens' argument on appeal appears to differ from the argument he made in district court. In district court, Hutchens argued that the court's definition of bodily harm amounted to "adding elements to the crime that don't exist." On appeal, Hutchens argues that that the district court's definition of bodily harm "improperly removed an element of the crime from the jury's consideration." But Hutchens' primary argument in both district court and on appeal is that the court should not have given any definition of bodily harm. We reject the State's claim that we must review the jury instruction for clear error. When an alleged instructional error has been preserved at trial by a timely objection, an appellate court first considers whether the instruction was legally and factually appropriate and, if not, determines whether the error may be deemed harmless. *State v. Barrett*, 309 Kan. 1029, 1036-37, 442 P.3d 492 (2019).

The final version of the challenged instruction given by the district court read:

"The defendant is charged with the crime of aggravated kidnapping. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. The defendant took [M.D.] by force or threat.

2. The defendant did so with the intent to hold [M.D.] to inflict bodily injury on or to terrorize [M.D.].

3. Bodily harm was inflicted upon [M.D.].

4. This act occurred on or about the 6th day of September, 2016, in Pawnee County, Kansas.

"Insignificant bruises or impressions resulting from the act itself do not constitute 'bodily harm' for purposes of aggravated kidnapping.

"The term 'bodily harm' includes any unnecessary acts of violence upon the victim occurring after the initial abduction."

The State's proposed jury instruction included only the final sentence defining bodily harm: "The term 'bodily harm' includes any unnecessary acts of violence upon the victim occurring after the initial abduction." At trial, Hutchens opposed any definition of

9

the term but at defense counsel's request, the district court added the second-last sentence: "Insignificant bruises or impressions resulting from the act itself do not constitute 'bodily harm' for purposes of aggravated kidnapping."

Hutchens' overarching premise is that the district court should not have given a definitional instruction establishing the parameters of bodily harm but should have permitted the jury to use common knowledge to determine whether Hutchens inflicted bodily harm on M.D. He cites *State v. Royal*, 234 Kan. 218, 670 P.2d 1337 (1983), to support his claim. In *Royal*, our Supreme Court found no error in the district court's refusal to provide an instruction defining bodily harm because, in that case, the existence of bodily harm was not factually disputed when the defendant cut the victim with a knife. Under such circumstances, the court concluded "[t]he term is readily understandable and no instructional definition is ordinarily necessary." 234 Kan. at 223. Hutchens interprets this holding to mean that a district court should not provide a definition of bodily harm.

But the *Royal* court also noted that an instruction might be appropriate where the existence of bodily harm is factually disputed. 234 Kan. at 223 ("[I]f there is a fact issue as to whether bodily harm is sustained by a victim, the matter may be submitted to the jury under proper instructions."). And as Hutchens concedes in his brief, the Comment section to PIK Crim. 4th 54.220 suggests that a definition of "bodily harm" may be appropriate in an aggravated kidnapping case when the fact is disputed, but that definition should be "'any touching of the victim against the victim's will, with physical force, in an intentional, hostile, and aggravated manner, or the projecting of such force against the victim by the kidnapper not including trivial injuries likely to result from any forcible kidnapping by the very nature of the act.'" (Citing *Royal*, 234 Kan. at 222.)

We reject Hutchens' claim that the district court erred simply by giving a definition of bodily harm. Here, there was a significant fact issue on whether Hutchens inflicted bodily harm on M.D. sufficient to support the charge of aggravated kidnapping.

10

As a result, the district court also gave a lesser included instruction on kidnapping. Under these circumstances, the district court did not err by trying to give the jury some guidance on the meaning of the term "bodily harm."

On appeal, Hutchens only challenges the final sentence in the district court's instruction: "The term 'bodily harm' includes any unnecessary acts of violence upon the victim occurring after the initial abduction." Hutchens does not challenge the language in the second-last sentence of the instruction which he actually requested at trial. Hutchens argues that the last sentence of the instruction was legally inappropriate because (1) it did not conform to the actual definition of "bodily harm" declared by the Kansas Supreme Court in *Royal*, and (2) the instruction improperly diluted the State's burden of proof.

The district court turned to language in *Taylor*, 217 Kan. at 714, to define bodily harm in its aggravated kidnapping instruction. The district court included the language requested by the State that bodily harm includes "unnecessary acts of violence upon the victim, and those occurring after the initial abduction." 217 Kan. at 714. But the district court also included language requested by Hutchens in the same paragraph from *Taylor* stating that "insignificant bruises or impressions resulting from the act itself" do not constitute bodily harm for aggravated kidnapping. 217 Kan. at 714.

Hutchens is correct that the language from *Taylor* used by the district court to define bodily harm is not as complete as the Supreme Court's definition in *Royal*. But the district court essentially gave both the language requested by the State and the language requested by Hutchens in the instruction conference. And the gist of the definition given by the district court is the same as the definition recognized in Kansas caselaw, i.e., bodily harm includes unnecessary acts of violence on the victim, but not trivial or incidental injuries associated with the abduction itself. See *Peltier*, 249 Kan. at 421-22.

11

Hutchens argues on appeal that the district court's definition of bodily harm "improperly dilute[d] the State's burden of proof." In support, Hutchens cites *State v. Brice*, 276 Kan. 758, 771-74, 80 P.3d 1113 (2003), which holds that a trial court's jury instruction that "great bodily harm" means a "through and through bullet wound" amounted to a directed verdict and invaded the province of the jury in finding the existence of a required element of the crime of aggravated battery.

But the objected to language used to define "bodily harm" in Hutchens' case did not invade the province of the jury. The instruction simply informed the jury that the term "bodily harm" includes "unnecessary acts of violence upon the victim." It was up to the jury to decide whether the State presented evidence of such unnecessary acts of violence on M.D. If anything, the objected to language in the instruction narrowed the scope of injuries that would constitute bodily harm for aggravated kidnapping. As discussed, bodily harm under the aggravated kidnapping statute is not limited to unnecessary acts of violence *after* the initial abduction but encompasses unnecessary acts of violence before, during, and after the abduction. See *Smith & Miller*, 224 Kan. at 672; *Crowther*, 45 Kan. App. 2d at 572. This narrowed scope in the definition of bodily harm given by the district court benefitted Hutchens, and he cannot show prejudice arising from any error.

In sum, the district court could have given a more complete definition of bodily harm rather than the definition it provided in the aggravated kidnapping instruction. But limiting our analysis to the arguments asserted by Hutchens, we conclude that the district court did not err in giving the objected to definition of bodily harm to the jury. Finally, even if there was error, we agree with the State that reversal is not required in this case. The district court's definition of bodily harm encompassed the essence of term recognized in caselaw, i.e., bodily harm includes unnecessary acts of violence on the victim, but not trivial or incidental injuries associated with the abduction itself. See *Peltier*, 249 Kan. at 421-22. We do not find that this definition, if erroneous, affected the verdict on the aggravated kidnapping charge in light of the entire record. See *State v. Louis*, 305 Kan.

12

453, 457-58, 384 P.3d 1 (2016) (finding that if the challenging party objected to the instruction below, the district court's error is reversible if there is a reasonable probability that the error affected the outcome of the trial in light of the entire record).

HUTCHENS' STATEMENTS TO LAW ENFORCEMENT

Next, Hutchens challenges the district court's admission of that portion of the dash cam video which contained statements by Hutchens in response to questioning by law enforcement. Hutchens contends that the questioning constituted a custodial interrogation and he was not advised of his *Miranda* rights. Hutchens objected to the video at trial on the same grounds. The State argues that Hutchens was not formally in custody when he was questioned on the scene of the traffic stop, so no *Miranda* violation occurred. But even if a violation occurred, the State argues that any error was harmless.

The Fifth Amendment to the United States Constitution guarantees individuals the right against self-incrimination. *State v. Salary*, 301 Kan. 586, 604, 343 P.3d 1165 (2015). To protect this right and to safeguard against impermissibly coercive interrogations, government agents must inform a person in custody of the right to remain silent and the right to the appointment of counsel before conducting an interrogation. *Miranda*, 384 U.S. at 444-45. The government's failure to provide required *Miranda* warnings requires suppression of the statements as evidence against the individual in the State's case-in-chief at trial. *Oregon v. Elstad*, 470 U.S. 298, 308-09, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985). The State bears the burden at trial to establish the legality of the evidence. *State v. Guein*, 309 Kan. 1245, 1252, 444 P.3d 340 (2019).

*Miranda* involved four separate cases where law enforcement officers took the defendant into custody at a police station for the purpose of obtaining a confession. The Court made it clear that its decision was intended to apply to in-custody interrogations,

13

and the decision generally was not intended to apply to on-the-scene police questioning of a suspect in the fact-finding process. As the Court stated in *Miranda*:

> "Our decision is not intended to hamper the traditional function of police officers in investigating crime. [Citation omitted.] . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. . . . In such situations, the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." 384 U.S. at 477-78.

Appellate review of a challenge to a district court's suppression issue is bifurcated. The reviewing court first determines whether the district court's factual findings are supported by substantial competent evidence in the record. *Guein*, 309 Kan. at 1251-52. The procedural posture of this case is unusual. Because Hutchens' attorney made an oral objection to the un-*Mirandized* statements on the video as the State presented the video for admission, the district court did not hold a full suppression hearing but reviewed the video outside the presence of the jury. Ultimately, without making specific findings, the district court found that the encounter between Hutchens and the law enforcement officers transitioned from an investigatory detention to arrest at the point the officers conducted a pat-down search and placed Hutchens in handcuffs. Because the district court and the parties rely on the circumstances depicted in the video, the case does not present a significant factual dispute about the circumstances surrounding the traffic stop and Hutchens' arrest. Thus, Hutchens' challenge to the district court's suppression ruling presents a question of law subject to plenary appellate review. *Guein*, 309 Kan. at 1252.

> "The *Miranda* safeguards are triggered only when an accused is (1) in custody and (2) subject to interrogation. A custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom in any significant way. A custodial interrogation is distinguished from an investigatory interrogation which occurs as a routine part of the

14

fact-finding process before the investigation reaches the accusatory stage. [Citations omitted.]" *State v. Lewis*, 299 Kan. 828, 834-35, 326 P.3d 387 (2014).

Everyone agrees that Hutchens was placed in custody during the traffic stop on September 6, 2016, but the parties dispute the point he was placed in custody. The State draws the line at the point the officers formally arrested Hutchens and placed him in handcuffs. The district court drew this same line. Hutchens contends that the functional equivalent of arrest occurred much earlier in the stop.

At the heart of the custody analysis is an objective determination under the totality of the circumstances whether a reasonable person in the position of the defendant would have felt free to terminate the interrogation and disengage from the encounter. *Guein*, 309 Kan. at 1254. The difficulty lies in distinguishing an investigatory detention, such as a traffic stop, where the individual is not free to disengage from the encounter while law enforcement conducts an interrogation reasonably designed to investigate the circumstances to determine the existence of a crime, and arrest, where the interrogation is accusatory and designed to obtain incriminating evidence against a suspect of a crime. See *Michigan v. Long*, 463 U.S. 1032, 1051, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983) ("During any investigative detention, the suspect is 'in the control' of the officers in the sense that he 'may be briefly detained against his will . . . .'" [quoting *Terry v. Ohio*, 392 U.S. 1, 34, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)]); *State v. Regelman*, 309 Kan. 52, 59, 430 P.3d 946 (2018) ("A custodial interrogation is distinguished from an investigatory interrogation, which occurs as a routine part of the fact-finding process before the investigation reaches the accusatory stage.").

Whether an interrogation occurred during an investigation or after an individual was in custody is based on the totality of the circumstances. 309 Kan. at 59-60. To aid courts in distinguishing between a custodial interrogation and an investigatory interrogation, our Supreme Court has devised eight nonexclusive factors that impact the

objective custody determination. No one factor is necessarily definitive of the question, but not every factor needs to be present in order to conclude that the individual was in custody during the questioning. *Guein*, 309 Kan. at 1254; *Regelman*, 309 Kan. at 59. The factors are:

> "(1) the interrogation's time and place; (2) its duration; (3) the number of law enforcement officers present; (4) the conduct of the officer and the person questioned; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person questioned was escorted by officers to the interrogation location or arrived under his or her own power; and (8) the interrogation's result, e.g., whether the person was allowed to leave, was detained further, or was arrested after the interrogation." 309 Kan. at 59.

Many factors here do not suggest a restrictive environment. The stop occurred in the early evening hours in broad daylight. Other cars are seen in the video passing the alley where the stop occurred. Cf. *Guein*, 309 Kan. at 1255 (noting that a dark, deserted area during early morning hours weighed toward a finding of custody). The stop was not especially long; the duration of the stop from the point Carr pulled up behind M.D.'s vehicle until Hutchens was placed in handcuffs was about 36 minutes. See *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) (refusing to place a per se rule on the permissible length of detention for an investigatory detention, instead relying on the circumstances to determine the reasonableness of the duration). Hutchens was permitted to retain his cell phone during the entire interview until his formal arrest.

Early into the traffic stop, Carr repeatedly ordered Hutchens to remain in the vehicle when Hutchens attempted to get out. This demonstration of authority by Carr would tend to lead a reasonable person to believe that their freedom of movement was restricted, but this restriction on Hutchens' freedom is not alone enough to establish that he was in custody under *Miranda*. Carr was a single officer dealing with two occupants

16

of a vehicle (and a dog). He was investigating the report of a battery and possibly a volatile domestic dispute. Under these circumstances, an officer investigating the situation could reasonably separate the two occupants and exert some measure of control over their movements in an attempt to investigate the situation without converting the detention into a full-blown arrest. See *United States v. Hensley*, 469 U.S. 221, 235, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985) (in an investigatory detention, law enforcement officers "were authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop"). At this point, Carr did not ask significant questions of Hutchens, focusing on getting information from M.D.

Once other officers arrived, Hutchens was permitted to get out of the vehicle but was not allowed to let his dog out. It is not clear whether the officers requested Hutchens to get out of the vehicle or whether he complied with a command. But as Hutchens exited the vehicle, one of the deputies directed him where he should stand and as he stood at the back of M.D.'s vehicle, two deputies stood on either side. At least one deputy stood next to Hutchens during the entire stop, sometimes three deputies stood around him. Otherwise, Hutchens had freedom. He stood or sat on the trunk as he chose. He sent text messages without interference from the officers. Carr's discussion with Hutchens was first conversational, merely trying to get a picture of the situation.

During this discussion, Carr confronted Hutchens with the allegations M.D. made that he held her against her will and wanted to get Hutchens' version. Hutchens gave his story about asking M.D. for a ride to Hutchinson and that M.D. was driving. Carr returned to his patrol car and spoke to M.D., who provided a different account. Carr then returned to Hutchens and questioned him about driving. Hutchens affirmed that he had not been driving at any time. Carr conferred with one of the sheriff's deputies, and a deputy tried to find a contact number for Ensley, the truck driver in Great Bend who first called 911. When dispatch could not immediately provide a contact number for Ensley,

17

Carr returned to his patrol car and told M.D. that Hutchens claimed she was driving the whole time. Carr explained that he had two stories and was trying to confirm one of them.

About 21 minutes into the stop, Carr realized that he had observed a male driving the vehicle when he first saw it entering Ellinwood. At this point, Carr returned to Hutchens, and the tone of the discussion became more confrontational. Carr told Hutchens that "[y]ou need to be more honest with me right now." Carr explained to Hutchens that he had seen a male driving the car and then asked "Why did you lie to me?" Hutchens eventually admitted that he had been driving the vehicle but denied abducting M.D. or committing any violence against her. Carr again consulted with the sheriff's deputies and then returned to Hutchens to question him further about how far he had driven. Hutchens claimed that M.D. drove them outside Larned and then he took over the driving. He again denied that he touched her. Carr then returned to M.D. to confirm her story. Hutchens remained seated on the trunk of M.D.'s car or standing behind the car, and the dash cam video shows that he was continually texting on his phone. About 36 minutes into the stop, the officers arrested Hutchens and placed him in handcuffs.

The State argues that Hutchens was not in custody under *Miranda* until he was formally arrested and handcuffed. Hutchens argues that there was a functional equivalent of an arrest when he was ordered out of the car and surrounded by armed and uniformed police officers. Hutchens is correct that the questioning became more accusatory when Carr realized that he had observed a male driving the vehicle when he first saw it entering Ellinwood. But even after this point in the stop, Carr continued to question M.D. to confirm her story and he consulted with the other officers about the case. And during this time, Hutchens remained seated on the trunk of M.D.'s car or standing behind the car, without handcuffs, and he was continually texting on his phone.

In the end, we need not decide whether there was a functional equivalent of an arrest at some point earlier in the stop that should have triggered the *Miranda* warnings

18

because we find that any error in the admission of the challenged statements was harmless. Because the issue involves a constitutional error, this court must be prepared to declare that the error was harmless beyond a reasonable doubt. *State v. Walker*, 304 Kan. 441, 457, 372 P.3d 1147 (2018).

After Carr confronted Hutchens stating that he had observed a male driving the vehicle as it entered Ellinwood, Hutchens eventually admitted that he had been driving for at least part of the trip. But this is a conclusion the jury almost certainly would have reached based on M.D.'s testimony, Ensley's eyewitness testimony of what he saw in Great Bend, and Carr's testimony about observing a male driving the vehicle as it entered Ellinwood. Throughout the questioning, both before and after the 21-minute mark of the stop, Hutchens denied abducting M.D. or committing any acts of violence against her. The key factual dispute at trial was whether Hutchens forced M.D. into her car in Larned and whether he physically kept her from getting out of the car during the drive from Larned into Ellinwood. On this key point, M.D.'s testimony was corroborated by Ensley's observations in Great Bend. Hutchens made no incriminating statements in the last 15 minutes of the dash cam video that established his guilt of the charged crimes.

We conclude that any error in the admission of the video did not create a reasonable possibility of a different verdict at trial than if the video had been excluded in whole or in part. Any error in the admission of Hutchens' statements was harmless beyond a reasonable doubt and does not entitle Hutchens to receive a new trial.

ERROR IN THE ADMISSION OF THE DASH CAM VIDEO BASED ON DISCOVERY VIOLATION

Next, Hutchens claims the district court erred in admitting the dash cam video of his encounter with law enforcement, mainly because of Carr's assertions on the video that Hutchens had been lying to him. Hutchens contends that these statements violated the rules of trial conduct set out in *State v. Elnicki*, 279 Kan. 47, 54-57, 105 P.3d 1222 (2005)

19

(finding district court committed reversible error by allowing jury to see videotape of law enforcement officer repeatedly challenging defendant's credibility and calling him a liar). Conceding that trial counsel did not object based on *Elnicki* when the video recording was offered as evidence at trial, Hutchens argues that the failure to object was the product of the State's late disclosure of the video recording, which prejudiced defense counsel's ability to review and plan defense objections.

In the last 15 minutes of the dash cam video, after it had occurred to Carr that he saw Hutchens driving the vehicle as it entered Ellinwood, Carr asked Hutchens a couple of times why he had been lying to him. The State asserts that the issue of whether it was error to admit Carr's statements on the video that Hutchens had been lying was not preserved with a proper objection at trial. The State also asserts that the district court did not abuse its discretion in denying Hutchens' request to exclude the video at trial due to its late disclosure.

Within two weeks of the filing of the complaint, Hutchens' counsel requested discovery. Later, after original counsel had been replaced, Hutchens' new counsel filed another request for discovery. The requests were broad enough to encompass the dash cam video of the traffic stop of M.D. and Hutchens in Ellinwood. The record shows that defense counsel received a copy of the dash cam video about one week before trial. At the time, defense counsel viewed the initial portion of the video related to the stop of the vehicle and M.D.'s initial statements to Carr. Defense counsel did not view the entire video but did not foresee any objection, believing the content to replicate the testimony. During the trial, the prosecution sent defense counsel an email advising counsel about some statements in the video related to Hutchens' previous commission of some crimes and spending time in prison. Defense counsel then objected to the admission of the video. Alternatively, counsel suggested that the video be played through the stop and the initial statements of Hutchens and M.D. and that the court exclude the remainder of the video.

Instead of categorically excluding the video, the district court granted a recess to permit defense counsel to review the entire video and note any objections he had to the video's admission. After the recess, the court asked whether defense counsel had a chance to review the video, and defense counsel responded that he had been given "adequate opportunity." The only objections lodged by defense counsel pertained to statements about Hutchens' criminal past and the *Miranda* issue. Later, after the district court viewed the video, defense counsel again reiterated that he sought exclusion of the entire video but did not articulate a specific basis for the request. The district court excluded any reference in the video to Hutchens' criminal history or spending time in prison, but the court otherwise denied Hutchens' objection to the video.

K.S.A. 2019 Supp. 22-3212 addresses discovery of evidence in criminal prosecutions and states in part:

> "If, subsequent to compliance with an order issued pursuant to this section, and prior to or during trial, a party discovers additional material previously requested or ordered which is subject to discovery or inspection under this section, the party shall promptly notify the other party or the party's attorney or the court of the existence of the additional material. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this section or with an order issued pursuant to this section, the court may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems just under the circumstances." K.S.A. 2019 Supp. 22-3212(i).

Because a district court possesses broad discretion to fashion an appropriate remedy for a statutory discovery violation, a reviewing court examines the district court's decision for an abuse of judicial discretion. See *State v. Miller*, 308 Kan. 1119, 1175, 427 P.3d 907 (2018). Judicial discretion is abused when the exercise of discretion is outside the applicable legal framework, lacks evidentiary support, or is so arbitrary, capricious, or

21

unreasonable that a reasonable person in the position of the court would not have reached a similar decision. See *State v. Gentry*, 310 Kan. 715, 734, 449 P.3d 429 (2019).

Here, the district court was presented with a discovery violation by the State and had many remedies to choose under K.S.A. 2019 Supp. 22-3212(i). One of those remedies was excluding the evidence, but another reasonable option was to give the defense an opportunity to view the undisclosed evidence. Under the circumstances, the district court's approach was not arbitrary, capricious, or unreasonable. While the State failed to disclose the video promptly, defense counsel possessed the evidence a week before trial. The video is about 40 minutes in duration, and defense counsel should have had sufficient time to view the video before the trial.

After viewing the video during the trial, defense counsel said that he had been given an adequate chance to review the video. He did not suggest to the court that he needed additional time to consider the video. He then presented objections based on statements about Hutchens' criminal past and potential *Miranda* violations. Based on those objections, the court ruled that the video would be admissible in part.

Hutchens did not raise an *Elnicki* objection to the video until after the trial ended in his motion for new trial. His after-trial objection to the admission of the evidence did not comply with the contemporaneous objection rule. See K.S.A. 60-404 ("A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."); *State v. Ballou*, 310 Kan. 591, 614, 448 P.3d 479 (2019) ("A timely interposed objection, thus, comes *between* the introduction of the evidence at trial and its admission. In other words, a timely interposed objection is one that gives the district court the opportunity to make the ruling *contemporaneous* with an attempt to

22

introduce evidence at trial.") Thus, we conclude that Hutchens' *Elnicki* objection to the video is not properly before the court on appeal.

CUMULATIVE ERROR

Finally, Hutchens contends that the trial errors he has presented on appeal, while perhaps insufficient to warrant reversal individually, cumulatively undermined his ability to obtain a fair trial. The State responds that cumulative error does not require reversal.

To warrant reversal of a criminal conviction for cumulative trial error, the appellate court must be convinced that the combined effect of trial errors prejudiced the defendant's trial to an extent that they cannot be deemed harmless. In assessing the cumulative effect of errors during the trial, the appellate court examines the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). If any of the errors involved constitutional rights, the cumulative error must be deemed harmless beyond a reasonable doubt. *State v. Seba*, 305 Kan. 185, 215, 380 P.3d 209 (2016) (citing *United States v. Toles*, 297 F.3d 959, 972 [10th Cir. 2002]).

Here, we found the district court did not err in instructing the jury on the definition of bodily harm, but we added that any error would have been harmless. The only potential error we have identified is the district court's failure to exclude Hutchens' statements on the dash cam video based on a *Miranda* violation, but we found that potential error to be harmless. We also found that the claimed error based on the *Elnicki* violation was not preserved for our review. So we have identified only one potential error in this opinion, and a single error cannot support reversal under the cumulative error doctrine. *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018). Even if we

23

considered the district court's definition of bodily harm as a second error, we find that the combined effect of the trial errors did not prejudice Hutchens' right to a fair trial.

Affirmed.

* * *

ATCHESON, J., concurring in part and dissenting in part: A jury sitting in Pawnee County District Court convicted Defendant Zachary Mitchell Hutchens of aggravated kidnapping and several other less serious crimes in the abduction of M.D., his former girlfriend. The jury heard insufficient evidence to support the aggravated kidnapping charge and likely convicted him because of substantial defects in the instruction explaining the element of that crime requiring M.D. to have suffered bodily harm. I, therefore, respectfully dissent from that part of the majority opinion affirming the conviction.

I would reverse the conviction for want of evidence demonstrating bodily harm distinct from the minimal force Hutchens used to take control of and to confine M.D.— force necessary for simple kidnapping but insufficient to inflict bodily harm necessary to support aggravated kidnapping. The appropriate relief would require a remand to the district court to enter a judgment of conviction for simple kidnapping and imposition of a legally proper sentence for that crime. *State v. Wilt*, 273 Kan. 273, 278, 44 P.3d 300 (2002); *State v. Montgomery*, No. 108,164, 2016 WL 7428308, at *3-4 (Kan. App. 2016) (unpublished opinion).

If I were mistaken in my assessment of the evidence, the jury instruction's description of bodily harm required to elevate kidnapping to aggravated kidnapping was incomplete and so confusing as to create clear error in this case, especially given the limited evidence of physical injury to M.D. That error would require reversal of the conviction with a remand for a new trial on the aggravated kidnapping charge.

24

I generally concur with the majority's take on the other issues on appeal and, therefore, would affirm Hutchens' remaining convictions.

*Sufficiency of the Evidence*

Relevant here, kidnapping requires the perpetrator to "tak[e] or confin[e]" the victim "by force [or] threat" for the purpose of injuring or terrorizing the victim. K.S.A. 2019 Supp. 21-5408(a)(3). Kidnapping is a severity level 3 person felony. By statutory definition, kidnapping may entail some application of force to seize and then confine the victim. And some incidental bodily harm associated with that use of force will not elevate a simple kidnapping to aggravated kidnapping. *State v. Royal*, 234 Kan. 218, Syl. ¶ 7, 670 P.2d 1337 (1983) (minor injuries "likely to result from any forcible kidnapping by the very nature of the act, do not constitute 'bodily harm' as that term is used in the aggravated kidnapping statute"). The crime, nonetheless, becomes aggravated kidnapping, a severity level 1 person felony, "when bodily harm is inflicted upon" the victim. K.S.A. 2019 Supp. 21-5408(b). The criminal code contains no definition of "bodily harm," and the Kansas appellate courts have fashioned neither some kind of comprehensive meaning for the term as used in K.S.A. 2019 Supp. 21-5408(b) nor a predictive test for what degree of injury to the victim elevates kidnapping to aggravated kidnapping. Various cases offer less than fully illuminating descriptions. 234 Kan. at 222 ("[o]nly unnecessary acts of violence upon the victim and those occurring after the initial abduction"); *State v. Taylor*, 217 Kan. 706, 714, 538 P.2d 1375 (1975) ("any touching of a victim . . . with physical force in an intentional, hostile and aggravated manner").

The cases, however, do provide examples of what may or may not be bodily harm. Thus, we know that rape or other sexual abuse of the victim constitutes aggravating bodily harm. See *State v. Peltier*, 249 Kan. 415, 418-19, 423, 819 P.2d 628 (1991). And we know that the perpetrator's use of a deadly weapon to inflict even a minor wound on the victim in effecting a kidnapping is sufficient to aggravate the crime. See *Royal*, 234

25

Kan. at 222. But the court in *Royal* indicated "a scraped knee . . . , nosebleeds, fainting and stomach distress" do not cross the statutory threshold for bodily harm in a kidnapping case. 234 Kan. at 222. Likewise, "insignificant bruises or impressions resulting from the act itself" do not establish an aggravated kidnapping. *Taylor*, 217 Kan. at 714.

A jurisprudence of airy phrases and examples falling in various places on a continuum doesn't provide much guidance when a case rests close to a controlling line bisecting that continuum. This is such a case. A line—statutorily drawn as bodily harm inflicted on the victim beyond the force necessary to effect a kidnapping—divides simple kidnapping from aggravated kidnapping. We have to determine on which side of the line the evidence presented at Hutchens' trial falls. In doing so, we have to keep in mind that kidnapping is a continuing crime that encompasses a physical seizure of or exercise of immediate dominion over the victim usually coupled with some form of ongoing confinement. *State v. Zimmer*, 198 Kan. 479, 504, 426 P.2d 267 (1967) ("Kidnapping, which involves the detention of another, is a continuing offense."); see *State v. Legg*, 9 S.W.3d 111, 117 & n.4 (Tenn. 1999) (kidnapping continuing crime, citing case authority including *Zimmer*). The confinement need not last very long but it may. *State v. Buggs*, 219 Kan. 203, 214, 217, 547 P.2d 720 (1976) (no particular duration of confinement necessary to prove kidnapping); *Sumpter v. State*, No. 117,732, 2019 WL 257974, at *4 (Kan. App.) (unpublished opinion), *rev. denied* 310 Kan. ___ (2019). So Hutchens could use some amount of force incidental to seizing M.D. and then confining her in the car during the drive from Larned to Ellinwood—causing limited physical harm to her—without being guilty of aggravated kidnapping. On appeal, Hutchens concedes the elements of simple kidnapping were proved at trial and does not dispute his guilt for that crime.

In considering the sufficiency of the evidence, we are required to examine the trial record in a light most favorable to the State, as the prevailing party, thereby drawing reasonable inferences and resolving any conflicts in the evidence to its benefit. Whether

26

the evidence viewed that way satisfies an element of the crime of conviction entails statutory construction and presents a question of law we answer without any particular deference to the district court. *State v. Fisher*, 304 Kan. 242, 260-61, 373 P.3d 781 (2016).

The evidence of bodily harm to M.D. begins with her trial testimony that Hutchens grabbed her arm and forced her into her car, while they were at a park in Larned. M.D. also testified that when she tried to escape from the car, Hutchens grabbed and pulled her hair. He did so several times during the trip from Larned to Ellinwood. M.D. said she had a headache as a result.

As shown in the dash-cam video played for the jury, M.D. told Ellinwood Police Officer Jarrod Carr that Hutchens had yanked her hair. She also told him Hutchens punched her in the stomach "multiple times" without further quantifying the number or the specific circumstances. At trial, Officer Carr testified M.D. said she tried to get out of the car several times and Hutchens "pulled her hair [and] hit her a couple of times." Larned Police Officer Anthony Boor testified that M.D. told him Hutchens "hit her two times in the stomach and pulled her hair several times to keep her inside the vehicle."

Kevin Ensley, the Good Samaritan who called the police in Great Bend, testified that the driver of the car pulled M.D.'s hair and "was beating on her." When asked about Ensley's testimony, M.D. agreed she had been "struck in the face." During her trial testimony, M.D. did not otherwise mention being hit by Hutchens—only that he repeatedly pulled her hair. M.D. disclaimed any bruising or other physical injuries as a result of Hutchens' conduct. Officer Carr and Officer Boor testified they looked for and saw no visible injuries to M.D.

In a written statement M.D. provided to Officer Boor the same day as the incident and admitted as evidence at the trial, she recounted that Hutchens "pushed me [into] the

27

car," pulled her hair once "for crying," and pulled her hair "every chance I tried" to get out of the car. In the statement, M.D. did not mention that Hutchens hit or punched her. In evaluating the sufficiency of the evidence, the omission cannot be construed to mean Hutchens didn't punch M.D. There was evidence that he did. But it can be taken to show M.D. didn't consider that conduct to be particularly noteworthy, especially compared to the repeated hair pulling. She otherwise would have included it in the fairly detailed chronology she prepared for the Larned police.

The evidence establishes Hutchens grabbed M.D.'s arm to get her into the car. Nothing suggests that use of force was especially violent or injurious. Hutchens did not twist M.D.'s arm or break it to compel her compliance. The manner in which Hutchens seized M.D. at the outset of the kidnapping lacked the sort of bodily harm that would aggravate the crime. The balance of the evidence about Hutchens' physical contact with M.D. can be fairly characterized as limited and diffuse. Hutchens could deploy incidental force to confine M.D. after he seized her without committing an aggravated kidnapping. Only by substituting speculation for reasoned inference can I find something approaching the degree of bodily harm that would render M.D.'s confinement in the car from Larned to Ellinwood aggravated kidnapping.

M.D. tried to escape from the car at least several times, prompting Hutchens to grab or yank her hair to restrain her. M.D. said he pulled her hair one other time because she was crying. The hair pulling isn't sufficiently violent or aggravated to constitute bodily harm under K.S.A. 2019 Supp. 21-5408(b); it is of a kind with the harms described in *Royal* as legally insufficient. In the dash-cam video, M.D. said without elaboration Hutchens punched her in the stomach "multiple times." Imputing a number greater than two to that statement would be impermissibly speculative. And Officer Boor testified M.D. told him that Hutchens punched her twice in the stomach to quell escape attempts. M.D. did not mention those blows in her testimony or her written account. As I have explained, that bears on their significance, not their existence. According to Ensley,

28

Hutchens pulled M.D.'s hair and appeared to strike her in the head while they were stopped in Great Bend. Placing Ensley's testimony in context, he saw one of M.D.'s thwarted escape attempts. The evidence shows the punches to have been administered with limited force, since M.D. reported neither bruising nor pain as a result.

None of that singularly or collectively exceeds the incidental force that marks simple kidnapping and legally separates it from aggravated kidnapping. By way of counterpoint, I could at this juncture unfurl various hypotheticals that almost certainly would depict sufficient bodily harm to elevate the crime. For example, if a kidnapper repeatedly punched an escaping victim forcefully enough to cause significant swelling around the eyes or to fracture facial bones, a verdict for aggravated kidnapping presumably would be legally proper. Likewise, a kidnapper's gratuitous infliction of physical injury on a victim—wholly divorced from the actual seizure or the continued confinement—might well suffice. A single powerful blow to the face of a victim already tied to a chair could well constitute bodily harm rising to the level of an aggravated kidnapping.

It's not that hard to conjure various anomalous outcomes under the statutory scheme criminalizing kidnapping and aggravated kidnapping, particularly as construed in the case authority. For example, applied mechanically, the regimen would appear to require kidnappers who backhand their victims to silence their whimpering to be convicted of aggravated kidnapping if the blow results in a split lip. If the blow did not break the skin, it would amount to a rude, insulting, or angry touching rather than bodily harm. See K.S.A. 2016 Supp. 21-5413(a) (misdemeanor battery entails either "causing bodily harm" or "physical contact . . . done in a rude, insulting or angry manner"); *State v. Green*, 280 Kan. 758, Syl. ¶ 3, 127 P.3d 241 (2006) (recognizing "mere bruising" to be "bodily harm" consistent with misdemeanor battery rather than "great bodily harm" supporting aggravated battery charge). Kidnappers who literally put pistols to the foreheads of their victims to shut them up would be guilty of simple kidnapping and

29

aggravated battery. But under the sentencing guidelines, even consecutive sentences for simple kidnapping and aggravated battery would be considerably shorter than the sentence for aggravated kidnapping. Presumably, a kidnapper's infliction of substantial pain on his or her victim would elevate the crime to aggravated kidnapping, even if the means causes little or no physical injury. (Say, the use of pepper spray or a cattle prod on the victim.) That outcome, however, isn't an ineluctable legal conclusion. Less obvious still would be the legal effect of markedly demeaning treatment of the victim, such as the denial of adequate restroom access.

But this forensic exercise adds little to the examples found in the cases and is of no more help in evaluating an evidentiary record that falls close to the statutory line dividing the degrees of kidnapping, since the hypotheticals differ materially from what happened here. In short, given the descriptions of Hutchens' physical conduct directed at M.D. and the necessary integration of that conduct into her seizure and confinement, I cannot discern the requisite bodily harm to support a conviction for aggravated kidnapping. I would reverse that conviction and remand to the district court with directions to enter a judgment of conviction for simple kidnapping and to resentence Hutchens accordingly.[*]

[*]In coming to that conclusion, I am not oblivious to the deep emotional distress this incident has caused M.D. She was clearly distraught when Officer Carr rescued her, and the district court record shows she continued to experience significant symptoms of emotional trauma through the time of the trial. But the case authority plainly confines "bodily harm" as the element elevating simple kidnapping to aggravated kidnapping to physical harm.

*Jury Instruction*

As an alternative argument on appeal, Hutchens contends the jury instruction outlining the elements of aggravated kidnapping was legally deficient in the way it attempted to explain bodily injury. If I am correct about the lack of evidence supporting

the bodily injury element of aggravated kidnapping, the instruction issue is moot. But I, too, look at it as an alternative error that vitiates Hutchens' aggravated kidnapping conviction. The remedy for this error would be reversal and remand for a new trial on the charge.

The instruction sets out the elements of aggravating kidnapping and, in that respect, draws directly from PIK Crim. 4th 54.220. Hutchens doesn't quarrel with that aspect of the instruction. At trial, he objected to language the district court included to explain the term "bodily harm" for the jurors. The instruction conference preserved in the trial record is terse, so Hutchens' precise objection to the district court isn't easy to discern.

As the majority explains, the district court augmented PIK Crim. 4th 54.220 with two sentences discussing bodily injury. The first states: "Insignificant bruise or impression resulting from the act itself do not constitute 'bodily harm' for purposes of aggravated kidnapping." The second states: "The term 'bodily harm' includes any unnecessary acts of violence upon the victim occurring after the initial abduction." As the majority says, Hutchens focuses his appellate argument on the second sentence. But the district court's effort to explain bodily harm really can't be cleanly segmented. A challenge to the substance of either addition necessarily implicates the other, since they are interlocking parts of a unit that endeavors to define the concept for the jurors. The majority finds no error in the elements instruction but goes on to conclude any error would have been harmless, since there was no reasonable probability it would have affected the jury verdict. See *State v. Louis*, 305 Kan. 453, 457-58, 384 P.3d 1 (2016) (finding that if the challenging party objected to the instruction below, the district court's error is reversible if there is a reasonable probability that the error affected the outcome of the trial in light of the entire record).

31

The question here is whether the two sentences augmenting the standard instruction were legally appropriate. See *State v. Blansett*, 309 Kan. 401, 408, 435 P.3d 1136 (2019); *State v. Brown*, 300 Kan. 542, 554-55, 331 P.3d 781 (2014). A legally inappropriate instruction constitutes error. If a defendant does not object to an erroneous jury instruction in the district court, we apply a clear error standard on appellate review. K.S.A. 2019 Supp. 22-3414(3); *State v. Thurber*, 308 Kan. 140, 198, 420 P.3d 389 (2018). To find clear error, an appellate court must be "firmly convinced" the jurors would have reached a different verdict had they been properly instructed. *State v. Williams*, 295 Kan. 506, 516, 286 P.3d 195 (2012). The reviewing court must consider the full trial record in making that evaluation. 295 Kan. at 516. I would find the additions to be error. I apply the clear error standard simply because it is more favorable to the State. Given the evidence in this case, as I have already outlined, the instruction created reversible error under either the clearly erroneous standard or the less stringent standard for preserved error.

The additions to the instruction were confusing and impermissibly expanded the meaning of bodily harm to include incidental physical injury attendant to the kidnapper's seizure of the victim and any following confinement, thereby blurring the legal difference between simple kidnapping and aggravated kidnapping. I suppose some guidance on bodily harm should be included in a jury instruction on aggravated kidnapping when the evidence on the point is disputed or close. But I do not presume to fashion a suitable model, especially since I am writing singularly in dissent.

There are two related considerations bearing on bodily harm in an aggravated kidnapping charge. First, whether the specific physical contact between the kidnapper and victim rises to the level of bodily harm at all. And, second, whether that contact, if bodily harm, entails no more than the incidental force necessary to effect a seizure and continuing confinement common to both simple kidnapping and aggravated kidnapping.

32

Ironically, the two sentences the district court added to the aggravated kidnapping instruction are essentially lifted word-for-word from *Taylor*, 217 Kan. at 714, and *Royal*, 234 Kan. at 222. So in an abstract sense, they are correct legal pronouncements. But they have been removed from the context in which they were pronounced and the purpose for which they were pronounced. And, as I explain, the statements become misleading standing alone. That illustrates one of the dangers in simply quoting part of an appellate opinion as a jury instruction. See *State v. Miller*, No. 109,716, 2015 WL 3632029, at *7 (Kan. App. 2015) (unpublished opinion) (risky practice to extract language directly from judicial opinion to fashion nonstandard instruction because "[a] sentence pulled from a decision may not capture every pertinent aspect of a legal principle"). In addition, the legal education of most jurors consists of what they learn from the instructions. Judicial expression, particularly on display in an isolated sentence removed from its mooring in an opinion, may lack the brutal clarity and precision of meaning essential for an exemplary jury instruction. And in reviewing those irregular instructions, we must be careful not to superimpose our legal training and experience to smooth out their real shortcomings. See *Daniels v. State*, No. 119,485, 2019 WL 6646417, at *6 (Kan. App. 2019) (unpublished opinion).

The first sentence the district court added to the standard instruction says that insignificant bruising or impressions "do not constitute" bodily harm elevating a simple kidnapping to an aggravated kidnapping. And that's correct. The *Taylor* court, however, offered the statement simply as an illustration or example of what falls short of bodily harm. There are lots of other examples, as the *Royal* decision demonstrates. But as presented in the instruction, the statement can reasonably be understood to define the universe of bodily harm by explaining what is excluded. In other words, bruising and impressions are not bodily harm; everything else is. And that's incorrect. Misinformed in that way, the jurors easily could have concluded Hutchens' actions in repeatedly pulling M.D.'s hair to prevent her escape constituted bodily harm. They similarly could have decided that the rest of the physical actions Hutchens used to seize M.D. (grabbing her

33

arm) or to stymie her escape (punching her in the stomach twice and likely in the head) amounted to bodily harm, since none of it entailed "insignificant bruis[ing] or impressions."

If the statement lifted from *Taylor* were studiously presented as an accurate legal concept in the instruction, it should have qualified bruising and impressions *as examples* of what is not considered bodily harm. With that qualification, however, the statement really would have done very little to help the jurors understand the law pertaining to bodily harm or to apply that law to the facts in this case.

Although unrelated to the point Hutchens has raised, the statement is legally deficient in another material way. The language refers to bruising resulting from "the act itself" without explaining what constitutes the act. Because kidnapping is a continuing crime, "the act," properly considered, includes both the seizure and the following confinement. Without that knowledge about the crime, a jury could, rather naturally, construe the phrase to mean the kidnapper's physical actions in exercising initial dominion over the victim, distinct from any confinement. Here, again, that would impermissibly expand the concept of bodily harm supporting a conviction for aggravated kidnapping, since everything Hutchens did after forcing M.D. into the car would be included.

The second sentence the district court added to the jury instruction presents similar problems and tends to exacerbate the defects in the first. The statement is taken from *Royal* and reflects a correct, if limited, pronouncement about bodily harm. Although the statement offers a general description of what may be *included* as bodily harm, it doesn't actually offer a comprehensive definition. So, based on the instruction, physical contact other than "unnecessary acts of violence upon the victim" may or may not also be considered bodily harm. As a result, the statement does not offer especially useful

information about how to evaluate what Hutchens did to M.D. after he forced her into the car.

The phrase "unnecessary acts of violence" seems particularly jarring and almost certainly unhelpful to jurors. Quite arguably, hair pulling and punching are violent acts, even if they cause no discernible injuries. And all of that seems "unnecessary" in a common sense way jurors would likely consider the circumstances, since Hutchens shouldn't have kidnapped M.D. in the first place. The jurors, then, were left to ponder what might constitute a necessary act of violence that wouldn't qualify as bodily harm. Under the law, it would be some incidental injury or harm resulting from the sort of physical intrusion necessary to effect any forcible abduction, including both the seizure of the victim and his or her continued confinement. The instruction, however, doesn't attempt, let alone come close, to explaining that critical legal concept for the jurors.

The instruction failed to give the jurors the legal tools they needed to apply the facts to the bodily harm element of aggravated kidnapping in reaching a verdict. See *State v. Torres*, 294 Kan. 135, 147, 273 P.3d 729 (2012) (Jury instructions fail of their purpose if they "omit[] words that may be essential to a clear statement of the law."). Those tools were not supplied elsewhere in the instructions. The error cannot be dismissed as harmless in this case because the evidence of bodily harm elevating the crime to aggravating kidnapping was hardly clear or overwhelming. (As I have already explained, it actually was legally insufficient.) Had the jurors been fully and fairly apprised of the law on the point, I am persuaded they almost certainly would have convicted Hutchens of simple kidnapping.